**Andrea D. Coit, OSB #002640**
**acoit@eugenelaw.com**
**Jonathan M. Hood, OSB #133872**
**jhood@eugenelaw.com**
HUTCHINSON COX
940 Willamette Street, Suite 400
P.O. Box 10886
Eugene, Oregon 97440
Telephone:     (541) 686-9166
Facsimile:     (541) 343-8693
Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **HAYLEE CRAMBLIT**, | Case No.     6:24-cv-00557-MTK |
| Plaintiff, | **PLAINTIFF'S TRIAL MEMORANDUM** |
| v. | |
| **STATE OF OREGON, by and through the Oregon Department of Human Services, JODIE HOBERG,** in her individual capacity, and **BRIAN YARNELL,** in his individual capacity, | |
| Defendants. | |

Plaintiff's claims arise from her alleged wrongful termination from Defendant

Oregon Department of Human Resources. She has brought claims under ORS 659A.199

and ORS 659A.203, claiming she was terminated in retaliation for reporting qualifying

conduct related to Defendant Hoburg. She also has asserted a due process claim under 42

U.S.C. § 1983 against Defendants Hoburg and Brian Yarnell, for failing to provide her a

meaningful opportunity to be heard prior to her property interest in her public

employment being taken from her.

Page 1 – PLAINTIFF'S TRIAL MEMORANDUM

I.     **MATERIAL FACTS THAT WILL BE ESTABLISHED AT TRIAL**

Plaintiff, Haylee Cramblit, graduated from college in 2020 with a degree in social work. For personal reasons, Plaintiff had a strong desire to enter a profession where her primary contribution was to help make the lives of children better, and she worked hard to attain that goal. Plaintiff was hired by Oregon Department of Human Resources on November 30, 2020, as a Social Service Specialist 1, Child Protective Service Worker (CPSW). As a CPSW, Plaintiff's primary responsibility was to respond to cases of alleged child abuse or neglect of children in Lane County and to work with the child, the family and the State to find the best, safest outcome for the child.

Plaintiff loved her job. She was doing the work she believed she was meant to do, and she performed well in her position. She was a passionate and dedicated advocate for children. As the front-line intake CPSW, Plaintiff was required to work almost exclusively in the field. She had to locate the abusive and/or neglectful parents, assess the child's living conditions, and develop plans of action to protect children in immediate danger. Oftentimes, Plaintiff had to physically remove a child from their parent to protect them. This work is as dangerous as it is invaluable.

Plaintiff received positive performance feedback and an excellent performance evaluation for the one full evaluation period she worked for ODHS. She was never reprimanded or counseled during her employment with ODHS and was never the subject of discipline prior to her termination.

On October 26, 2022, Plaintiff was assigned a referral related to the alleged abuse and neglect of a three-year-old child (the Child). Allegations in the referral indicated that the Child was being housed in an unsafe, unsanitary and hazardous environment. It was reported that the Child was living in a travel trailer that did not have electricity, running water or a functional toilet, that the Child was exposed to drugs and drug paraphernalia, and that the Child was exposed to open waste. The assignment required a response action from Plaintiff within 24-hours.

Plaintiff and her co-worker, Nicole Tucker, an experienced CPSW who had a prior history with the involved family[1], went to the property to investigate. The trailer the parents and Child lived in was owned by the Child's aunt (his mom's sister – Aunt 1) and was located on rural property owned by another aunt (mom's other sister - Aunt 2.) The living arrangement was informal, with no lease or rental payments being made.

Aunt 2 was present on the property when Plaintiff arrived. She recognized Ms. Tucker from her prior assistance with the Child when he was born. Aunt 2 told Plaintiff that she believed the parents were actively using methamphetamine and heroin. She reported that the outside of the trailer was full of trash, that she had observed the Child wearing the same dirty clothes for multiple days, that he appeared unbathed, that he complained of hunger, and that his was minimally verbal, well below that of a normally developing three-year-old. Plaintiff and Tucker drove to the trailer and observed piles of garbage, rotting food, tools, broken glass and knives on the ground surrounding the trailer. Plaintiff noticed with alarm that the water and sewage lines to the trailer were severed. Plaintiff knocked on the trailer door multiple times with no response. Plaintiff left for the evening, intending to return the next day to try again to contact the parents.

The next morning, October 28, 2022, Aunt 2 called Plaintiff and told her that the parents had returned to the property in the middle of the night but had since left, and that they had left the Child with her. Plaintiff then called her supervisor, **Defendant Hoberg**, to discuss with her the unsuccessful attempt at initial contact with the family the previous day and the plan for the day. Plaintiff informed Defendant Hoberg that she had observed large piles of garbage, enough to fill multiple dumpsters, around the trailer and that the trailer did not have running water or working sewage or electricity. Plaintiff informed Defendant Hoberg that although the aunts had concerns for the Child's safety, neither was unwilling to act as safety service provider for the Child.

---

[1] Ms. Tucker had been called to the hospital when the Child was born due to suspicion that he had been born addicted to drugs.

During this same call, Plaintiff told Defendant Hoberg that she had concerns regarding the inside of the trailer because the initial screening report had indicated that the Child had access to drug paraphernalia.  Plaintiff informed Defendant Hoberg that Aunt 2 and Aunt 1 believed the Child to be in danger living in the trailer. Defendant Hoberg instructed Plaintiff to confirm that the trailer was owned by Aunt 1 and, if it was, then Aunt 1 could give Plaintiff permission to enter and view the inside of the trailer.

Prior to this case, Plaintiff had never entered a subject's home without their permission, and she would never have considered doing so this time without Defendant Hoberg's direction to her to do so.

After Plaintiff's call with Defendant Hoberg, she informed Ms. Tucker that Defendant Hoberg wanted them to get permission from the owner of the trailer to enter it and take photographs of its condition. Plaintiff thereafter asked for and received a copy of the title to the trailer from Aunt 1, showing her to be the owner of the trailer. Aunt 1 told Plaintiff and Tucker that they could go inside the trailer. Plaintiff and Tucker then drove down to the trailer.

Aunt 2 and another relative, a pregnant cousin of the Child's mother, walked down to the trailer to meet Plaintiff and Ms. Tucker. Aunt 2 was carrying a shovel, and the cousin was carrying a hammer. The parents were still not there. At the trailer, Aunt 2 tried to open the door, but it was locked, and her key did not work. She then tried to pry the door open with the shovel and hammer but was unsuccessful. Aunt 2 then called Aunt 1, told her the lock had been changed, and asked her if it was okay to break the window in the trailer door so they could enter. Aunt 1 said that was fine. The pregnant cousin started to break the window with the hammer. Ms. Tucker, concerned for the pregnant woman's safety, took the hammer from her and broke the window herself. Once the door was open, Plaintiff, Ms. Tucker, Aunt 2 and the cousin went inside.

Inside the trailer, Plaintiff confirmed that there were no working utilities. There was no running water, electricity or flushing toilets. There was a bucket in the toilet

containing feces. The tables, floor, and the only bed in the RV were littered with drug paraphernalia, including used heroin foils, loose marijuana, and a bong. There was garbage strewn about and only plywood on the trailer floor. Plaintiff took photographs of these conditions.

Having observed the Child's living conditions, Plaintiff believed there was sufficient grounds to remove the Child from his mother's care. Having viewed the drug paraphernalia in areas accessible to the Child, including the bed in which he had been co-sleeping, Plaintiff also had sufficient grounds to have the Child tested for drugs.

The Child's drug test was positive. The Child, just three years old, had heroin and methamphetamine in his system.

After viewing the inside of the RV, Ms. Tucker called Defendant Hoberg on speaker phone for further instruction, with Plaintiff listening. Ms. Tucker described to Defendant Hoberg the condition of the inside of the RV and relayed the fact that the parents were still unreachable. Plaintiff believed that because of their observations within the trailer, the inability to reach the parents, and the sister's inability to care for the Child, a Protective Action Plan was needed to ensure the Child remained safe from further exposure to drugs and unsafe home conditions. Defendant Hoberg agreed with this plan.

Plaintiff thereafter sent an email to Defendant Hoberg setting forth what occurred and what she witnessed inside the trailer. On November 1, 2022, Plaintiff, Ms. Tucker, Defendant Hoberg, Assistant Attorney General Tricia Gonzalez, and court worker Megan Meyer held a meeting to discuss the Child's case. During that meeting, Plaintiff and her colleague discussed in detail the conditions inside the trailer and the concern that the parents had been unreachable during the entirety of the outreach. They further expressed their concern that the Child would continue to be exposed to dangerous and unsanitary living conditions without ODHS intervention. Based on that information, Defendant Hoberg and AAG Gonzalez determined that the state needed to petition for custody of the Child.

A "shelter hearing" was convened on November 7, 2022, to determine the ODHS's petition for temporary custody of the Child. The petition submitted to the court detailed Plaintiff's observations of the inside of the trailer. Plaintiff had printed copies of photographs she had taken, including inside the trailer, and given those to all involved parties prior to the hearing. At the hearing, the attorney for the father told the prosecuting attorney that the father was claiming that he owned the trailer and that it had been illegally broken into by Aunt 2. The prosecutor asked Plaintiff if she had the parents' permission to enter the RV, which she did not. The prosecutor decided not to include the photographs in the evidence submitted to the court. She did, though, rely on the report containing a description of the inside of the trailer. The state was awarded temporary custody of the Child.

After the shelter hearing, Plaintiff and Ms. Tucker called Defendant Hoberg to alert her that the father was claiming to be the owner of the trailer and had accused them and Aunt 2 of illegally breaking into his home. Defendant Hoberg asked for a copy of the trailer's title showing Aunt 1 to be the owner and Plaintiff emailed that to her.

On November 8, 2022, Plaintiff and Defendant Hoberg became aware that on November 1, 2022, the Child's mother had made a report to the Lane County Sheriff's Department regarding the October 28, 2022, entry into the trailer. According to Mother's report, she claimed to be the owner of the trailer, and she accused Aunt 2 of breaking the window. Plaintiff clarified with Ms. Hoberg that Ms. Tucker had actually broken the window, not Aunt 2.

Defendant Hoberg was alarmed when she received a copy of the police report. Plaintiff believes that Defendant Hoberg was worried that she may have instructed Plaintiff to access the trailer illegally and to avoid the potential consequences of that instruction, Defendant Hoberg made the decision to deny her role in the entire event and place the blame on Plaintiff.

On November 8, 2022, Defendant Hoberg contacted ODHS Human Resources, **Defendant Brian Yarnell**, and falsely reported that on November 7, 2022, Plaintiff disclosed to her that she had disobeyed Ms. Hoberg's direct order NOT to enter the RV without the permission of the Child's parents and that, because of Plaintiff's actions, there may be criminal consequences. Defendant Hoberg reported to Mr. Yarnell that she was unaware until November 7 that Plaintiff had gone inside of the trailer.

As a result of Ms. Hoberg's false report to Defendant Yarnell that Plaintiff had illegally entered the RV despite being given a direct order not to do so, an investigation was commenced. Ms. Hoberg was actively involved in that investigation. During the pendency of that investigation and up through November 28, 2022, Plaintiff remained in her position, actively engaging in the work of a CPSW with no additional oversight or restrictions from Defendant Hoberg. In fact, Defendant Hoberg never confronted Plaintiff with a concern or counseling based on Plaintiff's alleged disobedience. This, of course, is because Defendant Hoberg knew that she had instructed Plaintiff to obtain the owner's permission to enter the trailer. If Plaintiff had violated a law or ODHS policy, she had done so at Defendant Hoberg's direction.

On November 24, 2022, Defendant Hoberg instructed Plaintiff to appear for a "fact finding" interview with Defendant Yarnell and herself. The interview was held on November 28, 2022, and was recorded. The interview proceeded as an examination of Plaintiff, with close-ended questions directed to her in search of a "yes" or "no" response. Defendant Hoberg wrote the majority of the questions. During the November 28, 2022, interview, Plaintiff was accused of illegally and against ODHS policy entering the trailer and taking photographs and then hiding her activity from Ms. Hoberg until she was forced to come forward after the November 7 shelter hearing when threats of criminal charges were being made.

In response to this allegation, Plaintiff clearly and unequivocally reported to Defendant Yarnell that Defendant Hoberg had instructed her to obtain permission to enter

the trailer from its owner, and that Ms. Hoberg said if she had that permission, she could

go inside. She told Defendant Yarnell that she and Ms. Tucker had a telephone call with

Defendant Hoberg after entering the trailer and discussed next steps based on what they

had observed and what to do with the Child as his parents could not be located. She

explained that Defendant Hoberg participated in numerous discussions with her, the

prosecuting attorney, and the other CPSW about the contents of the inside of the trailer.

She explained that she called Defendant Hoberg after the November 7 shelter hearing to

let her know the parents were claiming to be the owners of the trailer and alleging a

criminal break-in, and to assure Ms. Hoberg that she had confirmed that Aunt 1 was the

owner of the trailer.

When Plaintiff disclosed this information to Defendant Yarnell, he turned to Ms.

Hoberg **in that meeting** and asked if what Plaintiff was saying was true. Ms. Hoberg

lied. She said Plaintiff was not telling the truth and that she had expressly instructed

Plaintiff not to go into the trailer without the parents' permission. She further falsely

reported to Defendant Yarnell that she was unaware of the entry into the trailer until after

the shelter hearing on November 7.

Defendant Yarnell should have stopped the interview immediately after Plaintiff's

report of Defendant Hoberg's instructions to her and removed Defendant Hoberg from

the investigatory process. ((Ms. Tucker was also being investigated at this same time and

she made the same reports about Defendant Hoberg.) Defendant Yarnell should have then

done something to look into Plaintiff's claim. For instance, he could have looked at

Plaintiff's email to Defendant Hoberg in which Plaintiff described the inside of the trailer

and the absence of the parents; he could have looked at the report of the November 1

meeting, where the same issues were discussed with Ms. Hoberg; he could have looked at

Ms. Hoberg's or Ms. Tucker's phone records to confirm the call between Defendant

Hoberg and Plaintiff/Ms. Tucker immediately following their entry into the trailer; he

could have interviewed the other two participants in the November 1 meeting to

determine if Plaintiff had, in fact, disclosed that she had entered the trailer; or he could have reviewed the report submitted by Plaintiff and Defendant Hoberg at the November 7, 2022, shelter hearing, in which the content of the inside of the trailer was described in detail, along with the inability to locate the parents.

Defendant Yarnell did none of that. Instead, he took Ms. Hoberg's denial as being the truth and followed her recommendation to place Plaintiff on paid administrative leave for her insubordination. Ms. Hoberg thereafter concealed from all involved decision makers the fact she had instructed Plaintiff to take the actions she was being disciplined for. Defendant Yarnell allowed Defendant Hoberg to continue her involvement in the investigation, never disclosing to the decision-makers that Plaintiff had reported to him that Defendant Hoberg instructed her to enter the trailer with the owner's permission or that Ms. Hoberg was aware of this entry well before the November 7 shelter hearing.

By letter dated January 20, 2023, ODHS notified Plaintiff that it was commencing the pre-dismissal process for just cause based on the following:

(1) failure to adhere to the Maintaining a Professional Workplace policy by entering the trailer without the parents' permission;

(2) failure to follow ODHS Casework Practice by failing to make initial contact within 24-hours;

(3) failure to use sound professional judgment by entering the trailer without the parents' permission; and,

(4) violation of the public's trust by entering the trailer without the parents' permission and concealing that information from her supervisor, Defendant Hoberg.

On January 29, 2023, Plaintiff submitted to Defendant Yarnell a rebuttal to the pre-dismissal notice in which she explained and rebutted the facts relied on by ODHS to conclude Plaintiff had committed the policy violations set forth in the pre dismissal letter. With respect to the failure to make contact within 24 hours, Plaintiff explained in detail the circumstances of her attempts to contact Mother in person at Aunt 2's property within

that time frame. The facts presented by Plaintiff on that issue were not in dispute and conclusively established she had not violated that policy.

The remaining alleged policy violations all turned on whether Plaintiff or Defendant Hoberg was telling the truth. If Plaintiff's statement was accurate, then she could not be dismissed for cause because she had acted on the instruction and with the knowledge and approval of Defendant Hoberg. If Plaintiff's statement was accurate, it was Defendant Hoberg who had engaged in conduct allegedly sufficient to justify termination for cause.

Defendant Yarnell did not take any action to look into the Plaintiff's rebuttal evidence. Instead, he forwarded Plaintiff's letter to Defendant Hoberg, asking if Plaintiff was telling the truth. Defendant Hoberg denied the allegations, accusing Plaintiff of dishonesty.

Plaintiff also asked Defendant Yarnell to include her rebuttal letter with all investigatory materials going forward, so the decision-makers would have her side of the story (and hopefully take some action to investigate her allegations against Defendant Hoberg). Defendant Yarnell assured Plaintiff, in writing, that he would include the information and her letter in his reporting. He did not. The decision makers in this case, Sheila Wegener and Sara Stankey, have testified that they never saw Plaintiff's letter, were not aware that she claimed that she had acted pursuant to Defendant Hoberg's instruction, and were not given the documentation described above that conclusively establishes that Defendant Hoberg had knowledge that Plaintiff had entered the trailer from the date the entry was made.

In her January 29, 2023, letter to ODHS, Plaintiff also reported that Defendant Hoberg continued to violate ODHS rules and policies regarding confidentiality and privacy after Plaintiff was placed on leave by contacting Plaintiff numerous times via her personal phone over text to discuss case sensitive information and have Plaintiff participate in case "staffings." She further reported to Defendant Yarnell and ODHS on

January 29, 2023, that Defendant Hoberg had directed her to delete those ODHS case-related text messages, an act Plaintiff thought was an illegal destruction of public records. Specifically, Plaintiff reported that on December 13, 2022, at 2:54 pm, Defendant Hoberg texted her the following: "And, please be sure to delete these messages as now I'm thinking we prob shouldn't be texting anything case specific." Defendant Yarnell never asked Plaintiff to provide the text messages that would have supported her allegations, he did not ask Defendant Hoberg for her text messages or even discuss Plaintiff's allegations with her. He did, though, as noted above, forward Plaintiff's allegations to Defendant Hoberg.

## II.     APPLICABLE LAW

### A.     Whistleblower Retaliation

The final decision maker on Plaintiff's termination was District Manager Sheila Wegener. The evidence will show that Ms. Wegener's termination decision was influenced by Defendant Hoberg, someone with a motive to retaliate against Plaintiff for her protected activity.

Ms. Wegener testified in her deposition as to why she chose to terminate Plaintiff's employment. She explained her motivation:

A.     We were going to dismissal, and then we talked about other options and then said I am not sure that is the right direction to go, because it wouldn't resolve the issue by having the worker go to permanency [a different department].

Q.     Would or would not?

A.     Would not.

Q.     And the issue being her -- what issue?

A.     The issue is being able to believe that a worker would follow supervisor direction and then bring information to their manager.

Q.    Okay. And the supervisor direction being?

A.    Don't go into the house.

Had Defendant Hoberg not misled Ms. Wegener through her false statements and concealment of the truth, Ms. Wegener would not have terminated Plaintiff's employment.

### B.    Due Process Violation

The evidence will show that Plaintiff did not receive adequate due process during the investigation and termination process. Defendant Hoberg had an actual conflict of interest. Defendant Yarnell allowed Defendant Hoberg to play the key role in the investigation and to have an active role in the disciplinary decision. Defendant Yarnell did not do anything to investigate Plaintiff's allegation that she was acting at Defendant Hoberg's direction and that Defendant Hoberg had full knowledge of all that occurred. Ms. Wegener testified in her deposition that she was not informed of Plaintiff's allegations against Defendant Hoberg and also was not given Plaintiff's rebuttal letter before Ms. Wegener made the decision to terminate. Due process requires that Plaintiff have a meaningful opportunity to be heard on the charges against her. Due process required Defendant Yarnell to provide the decision makers with Plaintiff's rebuttal to the charges prior to any decision being made.

These due process violations caused harm to Plaintiff. Ms. Wegener testified that, had she known of Plaintiff's allegations, she would have insisted on a further investigation and, if Plaintiff's allegations were true, their disciplinary decision would have been different.

## III.    DAMAGES

Plaintiff is passionate about working in child welfare. It is the career field she intended to pursue for the entirety of her working life. The work fulfilled a desire to help children in need and to protect the most vulnerable in our society. She took pride in her

role as a CPSW and found joy and satisfaction in her work. Since her termination, Plaintiff has applied for several positions within the public service field, including protective services and various dispatch services. While she is qualified for the positions and there is an urgent need for public welfare workers locally, Plaintiff has been unable to obtain a position because of the impact of the wrongful termination from ODHS. Instead, Plaintiff had to take a position working at Subway and as a legal secretary.

Plaintiff was accused of deceit and poor judgment during the termination process. Her termination letter stated that she is not credible and impliedly concluded that she was dishonest, none of which are true. Plaintiff was humiliated from this experience. She is unable to work in the field she worked so hard to enter, her character has been maligned in the local public welfare industry, making it impossible so far for her to reenter the profession she loves. Plaintiff has suffered depression, anxiety, sadness, and anger because of Defendants' actions.

DATED this 31st day of December, 2025.

HUTCHINSON COX

By:   s/ Andrea D. Coit
    Andrea D. Coit, OSB #002640
    Jonathan M. Hood, OSB #133872
    Of Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on <u>December 31, 2025,</u> I served or caused to be served a true and complete copy of the foregoing **PLAINTIFF'S TRIAL MEMORANDUM** on the party or parties listed below as follows:

- ☒ Via CM / ECF Filing
- ☐ Via First Class Mail, Postage Prepaid
- ☐ Via Email
- ☐ Via Personal Delivery
- ☐ Via Facsimile

Jill Schneider
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Fax: (971) 673-5000
Jill.Schneider@doj.oregon.gov

Of Attorneys for Defendants

HUTCHINSON COX

By: <u>  s/ Andrea D. Coit          </u>
     Andrea D. Coit, OSB #002640
     Jonathan M. Hood, OSB #133872
     Of Attorneys for Plaintiff